UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-----------------------------------------------------X

RACHEL ECKERT,

                Plaintiff,

    v.

CAROLETTE MEADOWS
281 Barnard St.
Buffalo, NY 14206;

ERIE COUNTY
92 Franklin St.
Buffalo, NY 14202;

MONROE COUNTY
39 W Main St.
Rochester, NY 14614;

ERIE COUNTY CLERK'S OFFICE
92 Franklin St.
Buffalo, NY 14202;

MONROE COUNTY CLERK'S OFFICE
39 W Main St.
Buffalo, NY 14614;

CITY OF BUFFALO
65 Niagara Sq. Room 1100
Buffalo, NY 14202;

BUFFALO POLICE DEPARTMENT
65 Niagara Sq. Room 1100
Buffalo, NY 14202;

JOHN DOE ERIE COUNTY CLERK 1
92 Franklin St.
Buffalo, NY 14202;

JOHN/JANE DOE MONROE COUNTY CLERKS 1–2
39 W Main St.

Case No. 26-CV-182

**VERIFIED COMPLAINT**
**(AMENDED)**
Jury Requested

Buffalo, NY 14202;

JOHN/JANE DOE JUDICIAL ADMINISTRATORS;

NEW YORK STATE DIVISION OF HUMAN RIGHTS
Agency Building 1,
Empire State Plaza
Albany, NY 12220;

NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
The Capitol
Albany, NY 12224;

STATE OF NEW YORK
99 Washington Ave.
Albany, NY 12231;

NEW YORK STATE UNIFIED COURT SYSTEM
25 Beaver St.
New York, NY 10004; and

INDIVIDUAL JUDICIAL DEFENDANTS,
SOLELY IN THEIR OFFICIAL CAPACITIES
FOR DECLARATORY AND PROSPECTIVE
INJUNCTIVE RELIEF FOR NON-JUDICIAL,
ADMINISTRATIVE, AND ULTRA VIRES ACTS,

Defendants.
----------------------------------------------------X

## I. JURISDICTION & VENUE

1. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under

the Constitution and laws of the United States, including 42 U.S.C. §§ 1983, the First and

Fourteenth Amendments, and the Fair Housing Act, 42 U.S.C. § 3617.

2. Declaratory and injunctive relief are authorized under 28 U.S.C. §§ 2201–2202.

3. Plaintiff's Fair Housing Act claims are informed by the U.S. Department of Housing and Urban Development (aka "HUD") interpretations and guidance, including HUD-818, recognizing liability for governmental interference with the enforcement of housing rights.

4. Venue is proper under 28 U.S.C. § 1391(b).

## II. PARTIES

5. Plaintiff Rachel Eckert is an individual homeowner and small business owner who resides in the State of New York, City of Buffalo, County of Erie. Plaintiff proceeds subject to a contemporaneous request for reasonable ADA accommodations to ensure meaningful access to the Court.

6. Defendant Carolette Meadows ("Meadows") is a private individual who resides in the State of New York, City of Buffalo, County of Erie.

7. County, City, Clerk, and Doe defendants are sued for policies, customs, practices, and acts that caused ongoing constitutional violations. Governmental employees also reside in the State of New York and County of Erie and/or Monroe. The constitutional violations alleged herein were caused by official policies, customs, and practices of the governmental defendants, including clerks' offices and court administration, and not by isolated acts of individual employees.

8. Defendant New York State Division of Human Rights ("NYSDHR") is a public entity charged with enforcing state and federal civil rights laws and administering discrimination complaints. NYSDHR is a "public entity" within the meaning of Title II of the Americans with Disabilities Act and receives federal financial assistance within the meaning of Section 504 of the Rehabilitation Act.

9. Defendant New York State Office of the Attorney General ("OAG") operates the Civil Rights Bureau and statewide civil rights intake portal and is responsible for investigating systemic civil rights violations by state actors. The OAG is a public entity subject the Title II of the ADA.

10. Defendant State of New York is a proper defendant for claims arising under the ADA Title II, Section 504 of the Rehabilitation Act, and the Fair Housing Act.

11. Defendant New York State Unified Court System ("NYSUCS") is responsible for the administration, policies, and practices governing docketing, case assignment, motion processing, issuance of orders, and access to appellate review in New York State courts. Plaintiff names this Defendant **solely for declaratory and prospective injunctive relief** to remedy ongoing constitutional and statutory violations arising from non-judicial and administrative practices. Plaintiff does not challenge judicial decision-making on the merits.

12. Individual judicial defendants are sued **solely for declaratory and prospective injunctive relief** and **solely for non-judicial, administrative, and ultra vires conduct**. Plaintiff does **not** seek damages for judicial rulings. Plaintiff does **not** seek review, reversal, or modification of any final state-court judgment, but challenges independent administrative practices and retaliatory conduct.

### III. CONSOLIDATED STATEMENT OF FACTS

### A. Pattern of Procedural Obstruction (2020–2026)

13. Since at least 2020, Plaintiff has experienced a multi-year pattern across multiple cases and counties of refusals to rule, refusals to issue written orders, refusal to allow Plaintiff to represent herself pro-se, misapplication of procedural statutes to block filings, failure to docket motions or assign judges, vacatur of defaults without motion or authority, failure to rule on emergency

motions, failure to provide any requested relief subject to CPLR and case law, and obstruction of appellate review.

14. The denial of Plaintiff's access to adjudication was not limited to isolated judicial acts but arose from **systemic administrative practices** within the New York State Unified Court System, including failures to docket filings, assign judges, issue written orders identifying governing authority, and provide neutral access to emergency housing relief and appellate review.

15. These practices deprived Plaintiff of meaningful access to courts for a span of over five (5) years. Fair procedural due process requires notice, a meaningful opportunity to be heard, and neutral application of governing procedures before a protected interest may be deprived.

**B. Denial of Access to Courts and Due Process Regarding Plaintiff's RAP Sheet**

16. Plaintiff's confidential criminal history record information, including an unredacted RAP sheet containing federal identifiers, was unlawfully obtained and disseminated by Defendant Meadows in 2022.

17. Plaintiff has never authorized the release of her RAP sheet to Defendant Meadows or any private individual.

18. Plaintiff filed complaints with the OAG regarding the unlawful release and dissemination of her RAP sheet.

19. The OAG assigned an investigator to Plaintiff's complaint, indicating that the matter warranted review.

20. Despite the assignment of an investigator, the complaint was subsequently closed without identifying the source of the disclosure, based on the detective's assertion that no individual would admit to providing the RAP sheet.

21. Plaintiff filed a New York State Freedom of Information Law request with the City of Buffalo and City of Buffalo Police Department for her RAP sheet. The City of Buffalo claimed RAP sheets are exempt from FOIL and denied Plaintiff any FOIL records about herself. Plaintiff's attempts to appeal were denied.

22. Plaintiff sought judicial relief to identify the source of the unlawful disclosure, including attempting to obtain discovery in related Article 78 proceedings to depose Defendant Meadows regarding how she obtained Plaintiff's RAP sheet.

23. Plaintiff's efforts to obtain discovery were denied, foreclosing her ability to identify the source of the disclosure or pursue available legal remedies.

24. As a result, Plaintiff has been denied all meaningful avenues reasonably available to identify the source of the unlawful disclosure of her confidential criminal  history information— containing federal identifiers—was leaked, disseminated, and used against her.

25. The denial of investigative and judicial mechanisms to identify the source of the unlawful disclosure deprived Plaintiff of meaningful access to courts and procedural due process, effectively foreclosing any avenue of accountability.

26. The continued circulation and use of Plaintiff's RAP sheet has caused ongoing reputational, emotional, and legal harm and has been used as a tool of retaliation and intimidation by Defendant Meadows.

### C. Asymmetric Fee Enforcement

27. Defendant Meadows repeatedly invoked court processes without paying required filing fees or obtaining fee waivers. This includes contempt proceedings and at least one Monroe County action believed docketed as **E2025001694**, for which there is no record of fee payment or waiver at the time of filing.

28. In contrast, Plaintiff's filings were repeatedly rejected, delayed, or conditioned on fees or waivers, in multiple cases.

29. This disparate enforcement denied equal access to courts.

### D. Prior Procedural Denials and Subsequent Retaliatory Proceedings

30. Defendant Meadows recently obtained an Order to Show Cause against Plaintiff that was signed by Donna Siwek. This proceeding followed Plaintiff's extensive protected activity, including litigation, appeals, HUD complaints, and public petitioning regarding housing safety and retaliation.

31. Judge Siwek previously presided over one of Plaintiff's defamation actions involving Defendant Meadows. At the outset of that case, Judge Siwek **denied Plaintiff's poor-person application,** citing the existence of multiple related cases between the parties and asserting that Plaintiff was not familiar with the CPLR. Judge Siwek further required Plaintiff to obtain a **certificate of merit,** a requirement **not applicable to Plaintiff's claims,** and denied access to filing absent compliance.

32. As a result of these procedural rulings, Plaintiff was delayed in adjudicating her claims and forced to incur procedural burdens not required by statute or rule. These actions **restricted Plaintiff's access to the courts at the threshold,** before any merits determination.

33. The subsequent signing of an Order to Show Cause in favor of Defendant Meadows—after Plaintiff engaged in protected petitioning activity and while Plaintiff's own requests for relief were denied or obstructed—forms part of a broader pattern in which **procedural mechanisms were used to advance Defendant Meadows' requests while restricting Plaintiff's ability to proceed.**

### Unequal Administration of Filing Procedures and Emergency Relief

34. In or about **2024**, Plaintiff commenced a **private nuisance action** seeking emergency relief related to the **structural integrity of her home**, including conditions that posed an immediate risk of further damage and potential safety hazards.

35. Plaintiff sought to file an **Order to Show Cause** requesting immediate judicial intervention and was advised that approval of her **poor person application** was required before the OSC could be presented for signature or filed with the court.

36. Plaintiff waited **for more than three hours** while clerk staff advised her that a judge was reviewing her poor person application.

37. During this time, Plaintiff repeatedly explained the **urgent nature of the relief sought,** including the need to address structural conditions affecting the safety and habitability of her home.

38. Despite Plaintiff's prolonged wait and repeated inquiries, no determination was issued on her poor person application, and Plaintiff was given inconsistent and shifting information regarding how or when her OSC could be filed.

39. As a result of the delay and lack of a ruling, Plaintiff was unable to file the OSC that day and was forced to leave without obtaining emergency relief.

40. By contrast, Defendant Meadows filed an **Order to Show Cause** in connection with related matters **without paying a filing fee and without obtaining a poor person waiver,** and the OSC was **signed the very next day.**

41. Plaintiff does not allege the merits of Defendant Meadows' OSC. Rather, Plaintiff alleges that the **disparate administration of filing requirements and access to emergency judicial relief** demonstrates non-neutral application of court procedures.

42. The unequal treatment of Plaintiff and Defendant Meadows in accessing emergency relief occurred in the broader context of Plaintiff's repeated requests for injunctive relief, disability accommodations, and access to courts, all of which were delayed or denied.

43. This disparity increased the risk of harm to Plaintiff's property and safety and foreclosed Plaintiff's ability to obtain timely judicial review, constituting a denial of meaningful access to courts and fair procedural due process. In fact, to date Plaintiff has received no relief to her emergency request to address interference with her right to repair her property.

### E. Miscaptioning, Transfer, and Clerk Obstruction

44. Plaintiff's private nuisance action was transferred with an inaccurate caption and mischaracterized as duplicative of defamation cases. After transfer, clerks rejected or failed to upload RJIs, returned blank rejection notices, and delayed judge assignment for months, foreclosing emergency adjudication while Defendant Meadows remained in default.

45. Plaintiff filed an Order to Show cause January 23, 2026 and the courts have sat on it, creating a non-neutral procedural delay (Meadows filed an OSC in what appears to be a contempt case on January 28, 2026 and the Judge signed the OSC January 29, 2026).

### Record Deletion / ADA Obstruction

46. On February 02, 2026 Plaintiff contacted the Buffalo City Court Clerk's Office to inquire about the status of her pending request for ADA accommodations. Plaintiff was advised that no motion or filing requesting accommodations appeared in the court file.

47. In October 2025, Plaintiff's ADA accommodation request had been **discussed on the record in open court,** and Plaintiff reasonably relied on that request being preserved and acted upon. Plaintiff was not provided any notice that the filing had been rejected, withdrawn, or denied.

48. This is not the first instance in which Plaintiff has discovered that filings have disappeared from public court records. In a separate Supreme Court action, documents previously appearing on the docket were later removed without notice, explanation, or identification of the individual responsible, and without any order authorizing deletion as required by law.

49. In response to Plaintiff's request for ADA accommodations, court staff in Judge Wilson's chambers asked whether Plaintiff had "approval from the ADA" to be considered disabled. The ADA does not require approval, certification, or determination by any agency. Plaintiff has documented medical impairments substantially limiting major life activities, and Defendants' imposition of a nonexistent eligibility requirement further delayed and denied meaningful access to court services.

50. The unexplained removal or disappearance of filings—particularly filings asserting federally protected rights—has repeatedly foreclosed Plaintiff's ability to obtain rulings, accommodations, and appellate review.

### F. Defaults Granted, Then Vacated Without Process

51. Plaintiff properly moved for default and injunctive relief; default was granted on January 15, 2026. Without any motion to vacate, statutory citation, findings, or leave to answer, the default was vacated on January 21, 2026, leaving Plaintiff without a clear procedural posture or appealable order.

52. Plaintiff properly requested the court to clarify its order and reasoning pursuant to Jud. Law and CPLR, and the court refused to clarify the order claiming it would be considered giving "legal advice". Instead, Plaintiff was forced to file a motion to renew/reargue.

53. This practice deprived Plaintiff of clarity regarding her procedural posture and foreclosed meaningful appellate review.

### G. Administrative Obstruction, Disability Discrimination, and Housing Interference

54. Since at least 2021, Plaintiff has filed multiple discrimination and civil rights complaints with NYSDHR and the OAG concerning racial discrimination, hate crimes, retaliation, denial of court access, exclusion from crime-victim services in multiple crimes, interference with Plaintiff's housing rights, and unlawful dissemination of criminal records with **federal** identifiers.

55. In connection with the most recent filings (2024 thru current), Plaintiff expressly requested reasonable accommodations due to disability under the Americans with Disabilities Act, including accommodations necessary to meaningfully access intake, investigation, notification, and complaint-processing procedures.

56. Defendants had actual knowledge of Plaintiff's disability and accommodation requests.

57. Despite this knowledge, Defendants failed to acknowledge or rule on the accommodation requests, failed to engage in an interactive process, and failed to modify intake or processing procedures.

58. Multiple complaints remain stalled in NYSDHR's intake unit for months and years with no investigation, determination, or lawful dismissal.

59. In or about January 2026, NYSDHR advised Plaintiff that her complaints remained in intake due to agency backlog and first-come, first-served processing, rather than any deficiency in Plaintiff's filings.

60. This response acknowledged the Division's continued inaction despite having actual knowledge of Plaintiff's disability and her requests for reasonable accommodations under the Americans with Disabilities Act.

61. Reliance on a neutral intake backlog policy after notice of disability and accommodation needs constituted a failure to reasonably modify policies and procedures, in violation of Title II of the ADA and Section 504 of the Rehabilitation Act.

62. The Division's prolonged inaction effectively denied Plaintiff access to the State's civil rights enforcement mechanisms and foreclosed any meaningful opportunity for investigation or relief.

63. These failures occurred while Defendants were on notice that Plaintiff was being prevented from repairing and maintaining her home and while Plaintiff was actively seeking emergency judicial and administrative relief.

64. The Division's continued refusal to act occurred after Plaintiff engaged in protected activity related to housing rights and while Defendants were aware that housing-related interference and retaliation were ongoing.

65. The Division's inaction had the purpose and effect of chilling Plaintiff's exercise of Fair Housing Act rights and allowing known housing interference to continue unabated, in violation of 42 U.S.C. § 3617.

### H. Retaliatory Use of CPS (Unfounded)

66. Defendant Meadows repeatedly weaponized Child Protective Services ("CPS") against Plaintiff as a form of discrimination and intimidation.

- **January 15, 2026:** Defendant Meadows initiated a CPS report on the same day Plaintiff initially prevailed in court. The report was based on allegations as to which Defendant Meadows **lacked firsthand knowledge** and is in the process of being closed as **unfounded**.

- **July 2025:** Defendant Meadows initiated a CPS report relying on **confidential and inaccurate medical information** concerning Plaintiff's minor child. Defendant

Meadows **had no lawful access** to this information and **no firsthand knowledge** of the alleged facts. That CPS report was investigated and determined to be **unfounded**.

67. Defendant Meadows is a licensed nurse with an active National Provider Identifier (NPI) and, upon belief, has professional access to protected health information systems. The use of detailed medical information in the CPS report supports a reasonable inference that such information was obtained or disclosed **without authorization** by Defendant Meadows.

68. Defendant Meadows has filed more than **ten** CPS reports against Plaintiff over approximately five years, all of which have been **unfounded**, demonstrating a pattern of retaliatory **misuse of CPS** rather than any legitimate child-safety concern.

69. In or about 2020, Defendant Meadows made statements to Plaintiff referencing Plaintiff's race and threatening CPS involvement; thereafter, CPS reports were repeatedly initiated and found unfounded.

70. In response to this conduct, Plaintiff filed two additional HUD complaints documenting CPS weaponization and retaliation. Defendant Meadows' repeated initiation of CPS reports without firsthand knowledge, lawful access to information, or substantiation constitutes harassment, retaliation, and interference with Plaintiff's protected rights.

### I. Denial of ADA Accommodations and Disability-Based Denial of Access

71. Plaintiff is an individual with disabilities, including cognitive, memory, and neurological impairments, as well as anxiety and major depressive disorder, which substantially limit major life activities, including concentration, information processing, and participation in complex legal and administrative proceedings.

72. Since at least 2024, Plaintiff has disclosed her disabilities in multiple judicial and administrative forums and has repeatedly requested reasonable accommodations under Title II of

the Americans with Disabilities Act to ensure meaningful access to proceedings, filings, communications, and enforcement mechanisms.

73. Plaintiff requested ADA accommodations on at least **five separate occasions**, including but not limited to:

a. **Monroe County proceedings** in which Plaintiff sought injunctive relief and emergency orders related to housing, safety, and retaliation in May of 2024;

b. **Monroe County proceedings**, including a formal request for ADA accommodations submitted in or about May 2024, which was never answered, ruled upon, or implemented;

c. **Housing-code enforcement proceedings**, in which Plaintiff requested accommodations necessary to meaningfully participate and defend against enforcement actions while repairs were being obstructed;

d. **Criminal proceedings in which Plaintiff was a crime victim**, where Plaintiff notified the District Attorney's Office of her disability and requested accommodations to receive notice, participate, and communicate, but was excluded from meaningful participation and not assigned a caseworker; and

e. **Administrative civil-rights complaints**, including filings with the New York State Division of Human Rights, in which Plaintiff expressly requested ADA accommodations to access intake, investigation, and complaint-processing procedures.

74. Defendants had actual knowledge of Plaintiff's disabilities and accommodation requests.

75. Despite this knowledge, Defendants repeatedly failed to acknowledge, grant, deny, or otherwise respond to Plaintiff's accommodation requests. No interactive process occurred, and no alternative or modified procedures were offered.

76. Proceedings and enforcement actions continued without accommodation, notice, or modification of procedures, even where Plaintiff's disability-related limitations were known and documented.

77. In housing-code enforcement matters, Plaintiff requested ADA accommodations to meaningfully participate and address alleged violations while simultaneously being prevented from completing repairs due to obstruction and retaliation. Those accommodation requests were denied or ignored, and enforcement proceedings continued without modification.

78. In criminal matters in which Plaintiff was a crime victim, Plaintiff requested ADA accommodations from the District Attorney's Office to ensure meaningful access, communication, and participation. Instead, Plaintiff was excluded from communication, not provided notice of proceedings or disposition, and not assigned a requested caseworker or accessible alternative.

79. Upon information and belief, the District Attorney's Office receives federal financial assistance, including funding related to victim services and criminal justice programs, rendering it subject to Section 504 of the Rehabilitation Act. Plaintiff was previously told by a lawyer that the Erie County District Attorney Office has her labeled as "persona non-grata".

80. After Plaintiff disclosed her disability and requested accommodations, Plaintiff's attempts to communicate with the District Attorney's Office were disregarded or blocked, calls were not routed or documented, and no accessible alternative means of communication were provided.

81. Plaintiff was not provided any written explanation for the denial of accommodations or exclusion from communication and was effectively barred from meaningful participation in matters affecting her safety and rights.

82. In administrative proceedings, including complaints filed with the New York State Division of Human Rights, Plaintiff requested ADA accommodations to access intake and investigation processes. Despite these requests, complaints were left stalled in intake for months and years with no investigation, determination, or lawful dismissal.

83. In January of 2026, the Division of Human Rights advised Plaintiff that her complaints remained in intake due to agency backlog and first-come, first-served processing, rather than any deficiency in Plaintiff's filings, and without any modification of procedures to accommodate Plaintiff's disability.

84. Defendants' repeated failure to provide accommodations after notice denied Plaintiff meaningful access to courts, enforcement mechanisms, and public services, and constituted deliberate indifference to Plaintiff's federally protected rights.

85. These failures were not isolated or inadvertent but occurred repeatedly across forums and jurisdictions, demonstrating a pattern and practice of denying Plaintiff equal access to public services and adjudicatory processes due to unmodified procedures.

## J. HUD Complaints and Notice

86. Following a firearm incident in October 2024, Plaintiff filed a HUD complaint alleging housing-related harassment and interference. HUD advised that Defendant Meadows would receive notice.

87. Retaliatory conduct followed after HUD notice.

## K. Discovery Obstruction via Mischaracterization

88. Plaintiff sought narrowly tailored discovery and evidentiary process necessary to investigate and prove defamation, retaliation, and housing-related interference, including subpoenas limited to Defendant Meadows' outbound communications to third parties and agencies.

89. Despite the narrow scope of these requests, Plaintiff's discovery efforts were **mischaracterized, blocked,** and **ultimately denied,** including by inaccurately describing Plaintiff's subpoena requests as seeking employment records when they sought only communications made by Defendant Meadows.

90. Plaintiff was further denied discovery through procedural obstruction, failure to issue written orders identifying governing authority, allowance of Defendant Meadows to submit procedurally improper filings while denying Plaintiff reciprocal discovery, and the use of procedural barriers that foreclosed Plaintiff's ability to obtain or preserve evidence.

91. These actions prevented Plaintiff from accessing evidence uniquely within Defendant Meadows' possession or control, impeded Plaintiff's ability to prove her claims, and deprived Plaintiff of a meaningful opportunity to litigate and seek redress.

### L. Prior First Amendment Litigation and Ongoing Retaliation

92. Plaintiff previously filed a federal civil rights action asserting First Amendment violations against a sitting New York State Senator, styled *Eckert v. City of Buffalo*, Case No. 1:22-cv-00540, in the United States District Court for the Western District of New York. That action concerned Plaintiff's exercise of protected speech and petitioning activity relating to matters of public concern and alleged misuse of governmental authority.

93. Since the filing of that action, Plaintiff has continued to engage in protected activity, including ethics complaints, public criticism of elected officials, and reporting of governmental misconduct and conflicts of interest to oversight agencies.

94. In early 2025, Plaintiff submitted an ethics complaint concerning the conduct of a sitting New York State Senator and the Senator's mother, who is employed within the New York State Unified Court System. The complaint raised concerns regarding conflicts of interest and abuse of

public resources to build brand awareness for Lisa Jacobs "Black Doll Exhibit" and books she authored.

95. On or about January 6, 2025, Plaintiff became aware of a public court proceeding in Lackawanna City Drug Court involving an adult sibling of the same sitting New York State Senator.

96. During that public proceeding, the individual stated in open court that she was the Senator's sister. In response, the presiding judge made a statement acknowledging familiarity with the Senator, including a reference to having recently attended a public event with her.

97. The proceeding occurred in open court and involved matters of public record. Plaintiff did not access sealed records, did not obtain non-public information, and did not disclose confidential material.

98. Plaintiff thereafter commented publicly on social media regarding the appearance of a close family member of an elected official in Drug Court and the statements made in open court, raising concerns about transparency, conflicts of interest, and the appearance of preferential treatment within the justice system.

99. Plaintiff's commentary did not assert criminal guilt, did not accuse any judicial officer of misconduct, and was limited to commentary on publicly observable events and statements made in open court. The commentary constituted protected speech on matters of public concern under the First Amendment.

100. Shortly after, a housing inspector appeared at Plaintiff's residence and issued citations relating to conditions not caused by Plaintiff, including alleged violations arising from garbage receptacles belonging to Defendant Meadows.

101. On or about March 3, 2024, Plaintiff publicly criticized the Senator's policy positions on criminal justice and public safety through social media commentary. Plaintiff's speech addressed matters of public concern and constituted protected activity under the First Amendment.

102. Within approximately two days of that protected speech, a summons was issued compelling Plaintiff to appear in housing court, initiating enforcement proceedings that interfered with Plaintiff's ability to repair and maintain her home.

103. Following Plaintiff's protected speech, ethics complaints, and prior First Amendment litigation, Plaintiff experienced a continuation and escalation of adverse governmental actions.

104. The temporal proximity and escalation of adverse actions following Plaintiff's protected speech and petitioning activity support a reasonable inference of retaliation and non-neutral use of governmental authority in response to Plaintiff's exercise of constitutionally protected rights.

## M. Ongoing Medical and Psychological Harm

105. Plaintiff has diagnosed anxiety and major depressive disorder (MDD). Treating providers have documented that prolonged stress materially exacerbates Plaintiff's symptoms. Plaintiff has been referred to an electrophysiologist for evaluation of post-accident symptoms following a motor-vehicle collision. Continued stress aggravates Plaintiff's conditions and increases the risk of further harm.

## N. Political Activity, Election Involvement, and Judicial Campaign Advocacy Supporting Joint State Action and Retaliation

106. Defendant Carolette Meadows held a leadership or representative role within the Masten District of the Erie County Democratic Committee, a political organization closely connected to local election administration and judicial campaigns.

107. In connection with her political activities, Defendant Meadows changed the address on her voter registration to an address at which she did not reside, for purposes of satisfying residency

requirements associated with a designating petition. Plaintiff attempted to challenge the address discrepancy and designating petition through the Erie County Board of Elections, but election authorities refused to process Plaintiff's filings or provide a mechanism for review.

108. Plaintiff thereafter submitted a complaint regarding the matter to the Erie County District Attorney's Office, including to Assistant District Attorney Gary Ertel, seeking investigation of the apparent election-law irregularities. The District Attorney's Office took no investigative action and issued no determination.

109. Defendant Meadows was publicly reported by a local news outlet to have been working at polling locations during a municipal election. According to the report, Defendant Meadows was shown standing next to an elderly voter and pointing out where to cast a write-in vote for an incumbent mayoral candidate, including producing a stamp to enter the candidate's name into the write-in space.

110. During the video, a third party can be heard stating, "That's illegal." Plaintiff does not allege a violation of election law as fact, but references the report and video as evidence of publicly documented election-related conduct that raised concerns regarding neutrality and the appearance of improper electioneering.

111. In addition to her election activities, Defendant Meadows actively promoted and advertised judicial campaigns associated with the Erie County Democratic Committee, including through grassroots efforts and affiliated political organizations.

112. Defendant Meadows' advocacy on behalf of judicial candidates occurred contemporaneously with Plaintiff's litigation, ethics complaints, election challenges, and public criticism involving the same local court system and political apparatus.

113. Defendant Meadows initiated fourteen (14) supreme court actions, out of which five (5) were targeted against the Plaintiff, six (6) federal court actions, and twenty-four (24) small claims court actions, including against a sitting Erie County legislator, alleging breach of contract. Plaintiff does not allege any impropriety related to the filing of that action, but notes that Defendant Meadows was able to access and utilize court processes without procedural obstruction and/or barriers.

114. Upon information and belief, Defendant Meadows receives Supplemental Security Income (SSI) benefits and has represented herself as disabled in other contexts.

115. By contrast, Plaintiff—despite documented disabilities and repeated requests for reasonable accommodations—has repeatedly experienced refusal to accept filings, denial of discovery, constructive denial of accommodations, and foreclosure of adjudicatory mechanisms across multiple courts and agencies.

116. In or about 2019, when a sitting New York State Senator was serving as a county legislator, the legislator shared a public social-media post concerning law enforcement body-camera policy. Defendant Meadows commented publicly on that post, asking whether the legislator needed "the hellraisers to storm the building."

117. Plaintiff later drew public attention to the comment through social-media commentary. Following Plaintiff's commentary, the comment was removed or deleted. Plaintiff preserved screenshots of the original comment as it appeared prior to deletion.

118. Plaintiff does not allege that the comment constituted a criminal threat or that unlawful action occurred. Rather, Plaintiff alleges that the comment and subsequent removal demonstrate the closeness of Defendant Meadows' political relationship with elected officials and the sensitivity of that relationship to public scrutiny.

119. Plaintiff raised concerns regarding Defendant Meadows' election-related activities, political advocacy, and judicial campaign involvement through available administrative and prosecutorial channels, including filings with election authorities and complaints to the District Attorney's Office.

120. No investigation, enforcement action, or formal response was undertaken in connection with those complaints.

121. Defendant Meadows' visible participation in election activities, judicial campaign advocacy, and political organizations—combined with repeated refusals by election authorities and prosecutors to accept filings or investigate complaints—further insulated Defendant Meadows from neutral enforcement mechanisms.

122. These actions and omissions occurred alongside escalating adverse actions against Plaintiff, including housing enforcement, false arrests, malicious prosecution, administrative obstruction, denial of disability accommodations, and exclusion from access to courts.

123. The cumulative effect of Defendant Meadows' political involvement and the knowing inaction of governmental entities supports a reasonable inference that Defendant Meadows acted with the acquiescence of state actors and that governmental processes were not administered in a neutral or even-handed manner.

### O. Joint Action / State Actor Allegations

124. Through repeated, coordinated use of state mechanisms timed to court events and facilitated by non-neutral administration, Defendant Meadows acted under color of state law through joint action and willful participation. These actions occurred with the knowing acquiescence of state officials who repeatedly acted on Defendant Meadows' requests while denying Plaintiff reciprocal access.

125. Plaintiff further evidenced that Defendant Meadows obtained Plaintiff's non-public **personally identifiable information ("PII")** from an employee or agent of the City of Buffalo without lawful authorization.

126. Defendant Meadows' possession and use of Plaintiff's PII was not information available to the general public and was subsequently used to further harass, retaliate against, and target Plaintiff, including through litigation, agency complaints, and intimidation.

127. The unlawful disclosure and use of Plaintiff's PII demonstrates Defendant Meadows' **joint participation with state actors** and further evidences action under color of state law.

128. This joint action included Defendant Meadows' receipt and use of Plaintiff's non-public PII unlawfully disclosed by a City employee, further enabling retaliatory use of state mechanisms.

129. These acts were not isolated, but occurred repeatedly and predictably in temporal proximity to Plaintiff's protected activity, permitting a reasonable inference of coordinated action and knowing acquiescence.

## IV. REQUEST FOR JUDICIAL NOTICE

130. In light of Plaintiff's disabilities and to avoid unnecessary duplication, Plaintiff respectfully requests that the Court take judicial notice in lieu of requiring repetitive attachment of voluminous public records that are readily accessible to the Court.

131. Pursuant to Federal Rule of Evidence 201, Plaintiff requests judicial notice of publicly available court records, dockets, orders, NYSCEF entries, appellate decisions, FOIL determinations, and filings in related federal actions referenced herein. These materials are matters of public record, capable of accurate and ready determination, and are relied upon to establish chronology, procedural posture, and notice.

132. This request includes judicial notice of HUD complaint filings, correspondence, and administrative records referenced herein, offered to establish notice, chronology, and protected activity.

133. Plaintiff further requests judicial notice of CPS determinations that the reports referenced herein were unfounded, offered solely to establish outcome, chronology, and lack of substantiation.

## V. CLAIMS FOR RELIEF

134. Plaintiff does not seek review or reversal of any state-court judgment, but challenges ongoing administrative practices and retaliatory conduct that independently violate federal law.

## COUNT I — DENIAL OF ACCESS TO COURTS
### (42 U.S.C. § 1983)-
Against Defendant governmental entities and officials, including County and City agencies, Clerk's Offices, and court administrative actors (collectively, the "Government Defendants")

135. Defendants engaged in a sustained pattern of conduct that denied Plaintiff meaningful access to the courts, including access to fair and timely adjudication, enforcement, discovery, and appellate review.

136. This conduct extended beyond isolated rulings and instead reflected **systemic obstruction** of Plaintiff's ability to litigate and enforce her rights.

137. Plaintiff repeatedly initiated actions and motions that were **authorized by statute, rule, and controlling case law**, including requests for emergency relief, defaults, discovery, subpoenas, and injunctive orders necessary to protect her housing, safety, family integrity, and livelihood. Despite Plaintiff's compliance with applicable procedural requirements, her filings were routinely **rejected, delayed, ignored, mischaracterized, and left undecided**, often without written orders or citation to governing authority.

138. Defendants and their agents denied Plaintiff access by, among other things:

- refusing or failing to rule on motions and emergency applications;

- failing to issue written orders identifying the procedural rule or statute relied upon, thereby **foreclosing appellate review**;

- miscaptioning and mischaracterizing Plaintiff's actions to justify consolidation or dismissal;

- selectively enforcing filing-fee and waiver requirements against Plaintiff while permitting Defendant Meadows to proceed without payment or waivers;

- vacating defaults and relief without motions, findings, statutory basis, or leave to answer;

- allowing Defendant Meadows to submit multiple procedurally improper filings while denying Plaintiff reciprocal procedural rights;

- obstructing discovery and evidence preservation by mischaracterizing subpoenas, refusing to rule on discovery requests, and blocking access to evidence uniquely within Defendant Meadows' control; and

- facilitating or tolerating retaliatory use of court processes, including contempt proceedings and CPS referrals, timed to Plaintiff's protected activity.

139. These actions **deprived Plaintiff of a meaningful opportunity to be heard**, prevented Plaintiff from developing and presenting evidence, and **blocked effective appeal**, resulting in actual and ongoing injury.

140. Plaintiff lost the ability to timely adjudicate housing and nuisance claims, obtain safety-related relief, pursue discovery necessary to prove retaliation and defamation, and secure appellate review of adverse actions.

141. Plaintiff's 2021 defamation action, which was transferred from Erie County to Monroe County, was subjected to excessive procedural barriers, including repeated threshold dismissals imposed in an arbitrary manner and without a stated basis in governing law, depriving Plaintiff of a fair opportunity to litigate a non-frivolous claim on the merits. While Plaintiff obtained relief on appeal, the excessive procedural barriers imposed in that action were consistent with similar obstacles encountered by Plaintiff across multiple cases, demonstrating a recurring pattern of non-neutral procedural handling rather than an isolated error.

142. The denial of access was **not incidental**. Plaintiff's legally supported requests were consistently denied or left unresolved, while Defendant Meadows' requests—including those unsupported by statute or rule—were routinely accepted, expedited, or granted. This asymmetric administration of court processes **favored the adverse party** and operated to deter Plaintiff from continuing to petition the courts.

143. These deprivations were caused, in part, by administrative practices of the New York State Unified Court System that obstructed Plaintiff's access to adjudication and appeal. Plaintiff's access to courts was further denied through threshold procedural barriers, including denial of poor-person status and imposition of inapplicable filing requirements, while adverse applications proceeded.

144. As a direct and proximate result of Defendants' conduct, Plaintiff suffered **actual injury**, including the loss of adjudication of housing-related claims, inability to enforce property and safety rights, obstruction of discovery, foreclosure of appellate remedies, and ongoing irreparable medical and psychological harm. These injuries cannot be fully remedied by monetary damages alone.

145. Plaintiff's injury is not mere delay or dissatisfaction with procedure, but the ongoing denial of the practical benefit of a **valid court order** granting access and protection necessary to repair her home, resulting in escalating structural damage, safety risks, and irreparable harm.

146. The obstruction resulted not merely in delay, but in the permanent loss of meaningful judicial review and available remedies. Defendants' conduct plausibly satisfies the elements of a denial-of-access claim by intentionally obstructing Plaintiff's ability to pursue and obtain judicial relief, resulting in actual injury. See *Lewis v. Casey*, 518 U.S. 343 (1996).

## COUNT II — PROCEDURAL DUE PROCESS
(42 U.S.C. § 1983)-
Against Defendant Carolette Meadows **and** Defendant governmental entities and officials, including County and City agencies, Clerk's Offices, and court administrative actors (collectively, the "Government Defendants")

147. Defendants deprived Plaintiff of protected liberty and property interests by arbitrarily denying access to state-created procedures, emergency relief mechanisms, fee waivers, and appeal rights. Defendants denied Plaintiff procedures that state law affirmatively provides.

148. Defendants deprived Plaintiff of **procedural due process** by repeatedly denying her the **minimum procedural protections guaranteed by law**, including notice, a meaningful opportunity to be heard, neutral application of governing rules, and reasoned decision-making capable of appellate review.

149. Plaintiff possessed protected **property and liberty interests**, including:

- the right to seek enforcement of housing, nuisance, and property-rights claims;
- the right to emergency relief to protect the safety and habitability of her home;
- the right to pursue discovery and subpoenas necessary to prove defamation, retaliation, and housing interference;
- the right to appeal adverse rulings; and

- the right to be free from retaliatory misuse of governmental processes.

150. Despite these protected interests, Defendants repeatedly denied Plaintiff due process through **arbitrary procedures**, including:

- denying or failing to rule on motions and emergency applications without notice or explanation;

- refusing to issue written orders or issuing orders that failed to identify the governing statute, rule, or legal basis, thereby **preventing compliance and foreclosing appeal**;

- vacating defaults and relief **without any motion, statutory authority, findings, or opportunity to be heard**;

- miscaptioning and mischaracterizing Plaintiff's cases to justify consolidations and dismissals;

- selectively enforcing procedural requirements, including filing fees, waivers, discovery standards, and motion practice, against Plaintiff but not against Defendant Meadows;

- allowing Defendant Meadows to file multiple procedurally improper answers and motions while denying Plaintiff reciprocal procedural rights;

- obstructing discovery and evidence preservation by mischaracterizing subpoenas, refusing to rule on discovery requests, and blocking access to evidence uniquely within Defendant Meadows' possession or control; and

- facilitating or tolerating retaliatory use of court processes, including contempt proceedings and CPS referrals, timed to Plaintiff's protected activity.

151. These actions were not isolated errors or discretionary rulings, but part of a **persistent pattern** that denied Plaintiff **notice, neutrality, and a meaningful opportunity to be heard**.

Plaintiff was left without clear procedural guidance, without enforceable rulings, and without access to appellate review.

152. Plaintiff was deprived of due process through established administrative practices that foreclosed access to adjudication at the threshold, including refusal to docket filings, refusal to issue written or appealable orders, and selective enforcement of procedural requirements. These practices rendered state remedies unavailable or meaningless in practice, as Plaintiff could not obtain rulings subject to appeal or enforcement despite repeated requests. Accordingly, post-deprivation remedies were constitutionally inadequate.

153. The non-neutral administration of court procedures by the New York State Unified Court System deprived Plaintiff of notice, reasoned decision-making, and a meaningful opportunity to be heard. Defendants denied Plaintiff procedures that state law affirmatively provides.

154. The cumulative effect of Defendants' conduct rendered the available procedures **fundamentally unfair,** depriving Plaintiff of due process under the Fourteenth Amendment.

155. Defendants' non-neutral application of filing-fee requirements deprived Plaintiff of due process by allowing an adverse party to proceed without compliance while denying Plaintiff equal procedural treatment.

156. The unauthorized disclosure and use of Plaintiff's PII by a state actor also deprived Plaintiff of due process and further denied equal and neutral access to judicial and administrative procedures.

157. The denial of poor-person status based on inapplicable standards and the imposition of non-statutory prerequisites deprived Plaintiff of a meaningful opportunity to be heard at the outset of litigation.

158. As a direct and proximate result of these due process violations, Plaintiff suffered actual and ongoing injury, including loss of adjudication of housing-related claims, inability to enforce property and safety rights, obstruction of discovery, foreclosure of appellate remedies, and continuing irreparable medical and psychological harm.

159. Defendants' actions plausibly satisfy the elements of a procedural due process violation by depriving Plaintiff of state-created procedural protections without notice, a hearing, or a meaningful opportunity to be heard.

160. The Second Circuit has made clear that a procedural due process claim under § 1983 requires a showing of a protected interest, deprivation by state action, and constitutionally inadequate procedures, particularly where, as here, the deprivation results from **established state procedures that deny access at the threshold rather than a merits determination.** See *Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 464–65 (2d Cir. 2006).

### COUNT III — FIRST AMENDMENT RETALIATION
(42 U.S.C. § 1983)-
Against Defendant Carolette Meadows and Defendant governmental entities and officials, including County and City agencies, Clerk's Offices, and court administrative actors (collectively, the "Government Defendants")

161. Defendants retaliated against Plaintiff for engaging in protected speech and petitioning activity by imposing punitive enforcement, obstructing compliance, and escalating adverse actions designed to chill further exercise of First Amendment rights.

162. Plaintiff engaged in extensive **protected activity** under the First Amendment, including but not limited to petitioning courts for emergency relief, filing nuisance and property-rights actions, pursuing appeals, filing FOIL requests and HUD complaints, filing discrimination complaints with NYS Division of Human Rights, seeking discovery and subpoenas, and speaking publicly about safety conditions, governmental inaction affecting her home, and corruption.

163. In response to this protected activity, Defendants subjected Plaintiff to a **pattern of retaliatory and punitive actions** that would deter a person of ordinary firmness from continuing to petition the government.

164. These actions were not limited to isolated incidents but constituted a coordinated course of conduct designed to pressure Plaintiff into abandoning her claims.

165. Defendant Meadows retaliated against Plaintiff by physically and procedurally obstructing necessary repairs to Plaintiff's home, including interfering with contractors and brandishing loaded firearms.

166. At the same time, Plaintiff was actively seeking court orders to compel access and compliance, relief that was repeatedly denied, delayed, or left undecided.

167. Despite Plaintiff's inability to perform repairs due to Defendant Meadows' obstruction and the courts' refusal to enforce Plaintiff's housing and property rights, the **City of Buffalo pursued housing-code violations against Plaintiff in Housing Court**, effectively penalizing Plaintiff for conditions she was **actively attempting—but being prevented—from correcting**.

168. This enforcement occurred while Plaintiff's petitions for judicial relief were stalled or obstructed, leaving Plaintiff trapped between **retaliatory obstruction** by Defendant Meadows and **punitive enforcement** by the City, with no meaningful avenue to comply. The predictable and intended effect was to **punish Plaintiff for petitioning activity**, chill further legal action, and coerce Plaintiff into abandoning her efforts to enforce her rights.

169. Additional retaliatory actions included:

- unfounded CPS reports timed to court proceedings and protected complaints;

- retaliatory contempt proceedings aimed at silencing Plaintiff's speech;

- selective and non-neutral application of procedural rules to deny Plaintiff relief while granting Defendant Meadows' requests;

- obstruction of discovery and evidence necessary to prove retaliation and housing interference;

- unlawful disclosure and use of Plaintiff's personal information to facilitate further harassment; and

- Unlawful access to the Plaintiff's minor child's medical records.

170. The **temporal proximity** between Plaintiff's protected activity and the adverse actions taken by Defendants, combined with the **pattern of escalation following each petition**, establishes a causal connection sufficient to plead retaliation. Defendants' conduct imposed concrete harms, including legal exposure, financial penalties, loss of housing safety, family distress, and severe medical and psychological injury.

171. The advancement of adverse proceedings following Plaintiff's protected petitioning activity, coupled with prior procedural barriers imposed on Plaintiff's filings, supports a reasonable inference of retaliatory use of court processes.

172. Defendants' actions would deter a person of ordinary firmness from continuing to seek judicial or administrative relief and therefore constitute retaliation in violation of the First Amendment.

173. Defendants' conduct plausibly satisfies the elements of First Amendment retaliation, as Plaintiff engaged in protected activity, Defendants took adverse action that would deter a person of ordinary firmness, and the adverse action was causally connected to Plaintiff's protected conduct.

174. The Second Circuit has held that a plaintiff states a cognizable First Amendment retaliation claim under § 1983 by alleging protected activity, adverse action sufficient to deter a person of ordinary firmness, and a causal connection demonstrated through timing or a pattern of escalation. See *Gill v. Pidlypchak*, 389 F.3d 379 (2d Cir. 2004); *Dougherty v. Town of North Hempstead Board of Zoning Appeals*, 282 F.3d 83 (2d Cir. 2002).

**COUNT IV — FAIR HOUSING ACT INTERFERENCE & RETALIATION**
(42 U.S.C. § 3617; HUD Interpretation incl. HUD-818)-
Against Defendant Carolette Meadows **and** Defendant governmental entities and officials,
including County and City agencies, Clerk's Offices, and court administrative actors
(collectively, the "Government Defendants", including State Agencies)

175. The Fair Housing Act (aka "FHA") makes it unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of rights protected by the Act, or because that person has exercised such rights. 42 U.S.C. § 3617.

176. Plaintiff's FHA-protected rights include the use, enjoyment, safety, repair, and habitability of her dwelling, and the right to seek enforcement and adjudication of housing and property-related claims, including nuisance, safety, and interference actions.

177. Plaintiff engaged in protected activity by:

- seeking emergency relief to protect the safety and habitability of her home;

- pursuing nuisance and property-rights actions;

- filing HUD complaints concerning housing interference and a firearm incident;

- and petitioning courts and agencies to enforce housing-related rights.

178. Defendant Meadows interfered with these rights through harassment, intimidation, retaliation, and coercive acts, including but not limited to:

- physical interference with multiple contractors needed for repairs;

- multiple retaliatory and unfounded CPS reports timed to court proceedings;

- misuse of contempt proceedings to punish protected speech;

- and actions intended to deter Plaintiff from pursuing housing enforcement.

179. Government Defendants also interfered with Plaintiff's FHA-protected rights by obstructing, delaying, and effectively denying adjudication of Plaintiff's housing and property-rights claims, including:

- refusing or failing to rule on emergency applications for housing-related relief;

- failing to docket filings, assign judges, or issue written orders necessary for appeal;

- miscaptioning and mischaracterizing housing actions as unrelated matters;

- selectively enforcing filing requirements and fee rules to block Plaintiff's access while allowing adverse filings to proceed;

- and vacating relief without motion, findings, or process, thereby nullifying enforcement of housing rights.

180. These acts interfered with Plaintiff's ability to obtain timely and meaningful adjudication of housing matters, including claims necessary to address structural safety, habitability, and interference with repairs, and thereby denied Plaintiff the full enjoyment and protection of her dwelling. Interference includes obstruction of enforcement mechanisms, not merely physical housing access.

181. Defendant Meadows' interference with Plaintiff's housing rights was accompanied by repeated hostile and derogatory references to Plaintiff's race. In public social-media posts and court filings, Defendant Meadows repeatedly referred to Plaintiff as "white," including using racialized and derogatory language.

182. Defendant Meadows also asserted that Plaintiff's race caused child-protective authorities to ignore complaints against her, while making contrasting references to herself as a Black mother.

183. Plaintiff alleges these statements not as independent claims of discrimination, but as evidence of hostility, intimidation, and retaliatory motive accompanying Defendant Meadows' interference with Plaintiff's housing rights.

184. Under HUD's interpretation of § 3617, including HUD-818, **state and local agencies and officials** may be **held liable** where their actions **interfere with, discourage, delay, or retaliate against the exercise of fair housing rights,** including by failing to provide neutral access to enforcement mechanisms. Interference includes obstruction of enforcement mechanisms, not merely physical housing access.

185. The interference by Government Defendants was not neutral or ministerial, but part of a pattern that discouraged, chilled, and obstructed Plaintiff's protected activity and favored the adverse party, resulting in ongoing harm to Plaintiff's housing rights.

186. Government Defendants, including the New York State Unified Court System, interfered with Plaintiff's enforcement of housing and property rights by obstructing neutral adjudication of nuisance, safety, and habitability claims.

187. Defendants' conduct was intentional, retaliatory, and had the natural and foreseeable effect of interfering with Plaintiff's FHA-protected rights.

Section 3617 prohibits conduct that interferes with a person's exercise or enjoyment of rights protected by the Fair Housing Act, including through **coercion, intimidation, or retaliation.** See *Francis v. Kings Park Manor, Inc.,* 992 F.3d 67, 75–76 (2d Cir. 2021).

188. Defendants conduct plausibly satisfies the elements of interference and retaliation under 42 U.S.C. § 3617 by engaging in coercive and retaliatory acts following Plaintiff's protected housing-related activity, including unfounded CPS reports, obstruction to neutral adjudication, and obstruction of enforcement.

## COUNT VI – ADA TITLE II (42 U.S.C. § 12132)
### Against NYSDHR, OAG, and State of New York

189. Plaintiff is a qualified individual with a disability.

190. Defendants are public entities subject to Title II of the ADA.

191. Plaintiff requested reasonable accommodations in connection with civil-rights complaints and intake processes.

192. Defendants had actual knowledge of Plaintiff's disability and accommodation needs.

193. Defendants failed to acknowledge, grant, or deny the requests, failed to engage in an interactive process, and failed to modify policies or procedures to ensure meaningful access. Defendants instead left Plaintiff's complaints indefinitely stalled in intake while ongoing harm continued.

194. Defendants acted with deliberate indifference to Plaintiff's rights.

195. Plaintiff suffered emotional distress, denial of access to justice, and loss of statutory protections.

196. Plaintiff seeks compensatory damages to the extent permitted by law, and declaratory and injunctive relief.

197. The Second Circuit has held that mental health conditions, cognitive impairments, and neurological injuries that substantially limit major life activities qualify as disabilities under Title II of the ADA, and that public entities must provide reasonable accommodations necessary to ensure meaningful access to their services and proceedings. Liability attaches where officials are on notice of the disability and fail to act, and monetary damages are available upon a showing of deliberate indifference. See *Weixel v. Board of Education of the City of New York*, 287 F.3d 138 (2d Cir. 2002); *Garcia v. SUNY Health Scis. Ctr.*, 280 F.3d 98, 115 (2d Cir. 2001).

198. Defendants' failure to maintain Plaintiff's ADA accommodation requests in the court record, and the subsequent representation that no such request exists despite discussion on the record, demonstrates deliberate indifference to Plaintiff's disability-related access needs and a failure to implement procedures to ensure meaningful access to judicial services.

## REHABILITATION ACT § 504 (29 U.S.C. § 794)
Against NYSDHR, OAG, and State of New York

199. Defendants receive federal financial assistance within the meaning of Section 504 of the Rehabilitation Act.

200. Plaintiff is an individual with a disability as defined by the Rehabilitation Act.

201. Plaintiff disclosed her disability and requested reasonable accommodations necessary to ensure meaningful access to civil-rights enforcement programs, complaint intake, investigation, notification, and adjudicatory processes.

202. Defendants had actual knowledge of Plaintiff's disability and her accommodation requests.

203. Despite this knowledge, Defendants failed to provide reasonable accommodations, failed to engage in an interactive process, and maintained policies and practices that denied Plaintiff meaningful access to programs and activities receiving federal financial assistance.

204. Defendants' refusal to modify procedures and failure to act after notice constituted discrimination **by reason of disability**, because Plaintiff was denied access to services that were otherwise available to members of the public who did not require accommodations. Plaintiff was otherwise qualified to participate in these programs and services and was excluded solely by the failure to provide reasonable accommodations.

205. Defendants acted with deliberate indifference to Plaintiff's federally protected rights by knowingly allowing inaccessible procedures and prolonged inaction to persist while ongoing harm continued.

206. As a direct and proximate result, Plaintiff suffered denial of access to civil-rights enforcement mechanisms, emotional distress, and loss of statutory protections.

207. Although Defendants' conduct was motivated by retaliation and the protection of a state actor- Defendant Meadows, Plaintiff's Rehabilitation Act claim rests on Defendants' failure to provide reasonable accommodations after notice, which denied her meaningful access to federally funded programs. The Second Circuit has held that in failure-to-accommodate cases, discrimination occurs 'by reason of disability' when the lack of accommodation is the mechanism of exclusion, regardless of mixed or retaliatory motives. *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 277–78 (2d Cir. 2003); *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158–59 (2d Cir. 2016); *Wright v. New York State Department of Corrections,* 831 F.3d 64 (2d Cir. 2016).

208. Plaintiff seeks compensatory damages pursuant to Section 504 of the Rehabilitation Act, as well as declaratory and prospective injunctive relief.

## RESERVATION OF RIGHTS

209. Plaintiff alleges facts supporting joint action and coordinated conduct among Defendants.

210. Plaintiff does not presently assert a separate conspiracy claim under 42 U.S.C. § 1985 because key evidence concerning communications, agreements, and coordination among Defendants is uniquely within Defendants' possession. Plaintiff expressly reserves the right to

seek leave to amend pursuant to Fed. R. Civ. P. 15 should discovery reveal facts supporting additional claims, including conspiracy.

211. The Second Circuit has recognized that the state-court prong of 42 U.S.C. § 1985(2) provides a cause of action where defendants conspire to impede the due course of justice and to injure a litigant for exercising the right to seek judicial relief, through overt acts designed to obstruct or retaliate against litigation activity. See *Keating v. Carey*, 706 F.2d 377 (2d Cir. 1983); *Kush v. Rutledge*, 460 U.S. 719, 726 (1983).

## VI. PRAYER FOR RELIEF

212. This action falls within the bad-faith and extraordinary-circumstances exceptions to Younger abstention, as Plaintiff lacks an adequate state forum and faces continuing irreparable harm. Plaintiff does not challenge judicial decision-making on the merits.

213. Plaintiff seeks compensatory damages against Defendants to the extent permitted by law, including against state defendants pursuant to Section 504 of the Rehabilitation Act, based on their acceptance of federal financial assistance and deliberate indifference to Plaintiff's federally protected rights. Plaintiff seeks declaratory and prospective injunctive relief against state defendants under Title II of the ADA, the Fair Housing Act, and 42 U.S.C. § 1983.

214. Plaintiff continues to be subject to the challenged administrative practices and retaliatory mechanisms, and there is a real and immediate threat of continued harm absent prospective relief.

215. Plaintiff seeks a Temporary Restraining Order and Preliminary Injunction solely to preserve the status quo and prevent further irreparable harm pending adjudication on the merits.

**WHEREFORE,** Plaintiff respectfully seeks the following relief:

A. **Declaratory relief** declaring that Defendants' actions and practices, as alleged herein, violate Plaintiff's rights under the United States Constitution and the Fair Housing Act;

B. **Prospective injunctive relief** prohibiting retaliation against Plaintiff for engaging in protected activity, including the misuse of court processes, agency complaints, contempt proceedings, or other state mechanisms;

C. **Prospective injunctive relief** requiring Defendants and their agents, in their administrative and non-judicial capacities, to **lawfully process Plaintiff's filings**, including timely docketing, assignment, and consideration of motions and emergency applications;

D. **Prospective injunctive relief** requiring that rulings on Plaintiff's motions and applications be issued in **clear written orders that identify the governing procedural rule, statute, or legal authority relied upon**, including applicable provisions of the CPLR or other controlling law, so that Plaintiff may understand the basis of the decision and preserve appellate rights;

E. **Prospective injunctive relief** prohibiting the selective or non-neutral application of procedural rules, including filing-fee requirements, defaults, discovery standards, and emergency relief mechanisms;

F. **Declaratory and injunctive relief** to prevent ongoing and irreparable harm to Plaintiff's housing rights, family integrity, medical and psychological health, harms that are **not fully compensable by monetary damages**;

G. Ordering the New York State Unified Court System to implement and enforce **neutral administrative practices** ensuring lawful docketing, timely adjudication, issuance of written orders citing governing authority, and meaningful access to appellate review in housing-related matters;

H. Plaintiff seeks **discovery** necessary to identify the full scope of Defendants' joint conduct and reserves the right to amend the pleadings to conform to the evidence;

I. **Costs and fees** as permitted by law; and

J. **Such other and further relief** as the Court deems just and proper.

Sincerely,

Rachel Eckert, pro-se

Executed February 02, 2026

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Rachel Eckert
2m Barnard St.
Buffalo, NY 14206